RUMPH v. ROWE, ADMR.

5-1783                    320 S. W. 2d 749

Opinion delivered February 16, 1959.

*Langston & Walker, Wayne Foster,* for appellant.

*Robinson, Sullivan & Rosteck,* for appellee.

GEORGE ROSE SMITH, J. Peter Dumas died January 2, 1958, at the age of eighty-five. On the preceding December 6 Dumas had conveyed his home in Little Rock to the appellant William Rumph, with a life estate being reserved to the grantor. By this suit the appellee, as administrator of Dumas's estate, seeks to have the deed canceled for fraud, undue influence, and lack of mental capacity. The chancellor set aside the deed and gave Rumph a lien for $255 for services rendered to the decedent. Both parties have appealed.

The testimony about Dumas's mental condition is in serious conflict. For the plaintiff two disinterested lay witnesses who had known Dumas for many years were of the opinion that he did not have the ability to comprehend a transaction such as the one in question. They say that Dumas talked at random, was forgetful, and at times did not recognize them. The only medical testimony is that of Dr. Ish, who knew Dumas for some ten years before his death. Among other professional visits Dr. Ish treated Dumas for influenza about December 4, 1957, and also attended him during his last illness later in the month. Dr. Ish judged his patient to have been senile, did not believe him fully capable of entering into a business transaction, and pretty well summarized his view by saying, "I believe he would know in a vague sense what he was signing."

On the other hand it appears that Dumas, a bricklayer, was able to work at least occasionally until November, 1957. The notary who came to Dumas's house to take the acknowledgment had not previously known Dumas, but he questioned the old man for twenty minutes or more and decided that he knew what he was doing. Another witness who accompanied the notary was of the same opinion. It should be added that the grantee, Rumph, arranged for the notary to come and was present when the deed was executed.

If the conveyance had been made for a consideration approaching the fair value of the property we would hesitate long before setting aside the sale. In this case, however, the consideration was greatly in-

adequate. The property is worth about $2,500. Rumph may have spent a few dollars in buying groceries for Dumas before the deed was made, but at most the total sum was trivial. According to Dumas's niece, one of the real parties in interest, Rumph told her that he was to pay Dumas $15 a month for life, beginning January 15, 1958. This obligation was not mentioned in the deed and, in view of the grantor's extreme age and ill health, was not likely to involve more than a small fraction of the property's value.

On its facts the case is closely similar to *Campbell* v. *Lux*, 146 Ark. 397, 225 S. W. 653, where we canceled a deed by which an aged man conveyed property worth $3,000 for a recited consideration of $100 in cash and $20 monthly payments for the rest of his life. The only significant difference between the two cases is that in the earlier one there appeared to be nothing in the relation between the parties to justify a belief that the grantor intended a gratuity to the grantee. Here it does appear that Rumph may have taken care of Dumas after the execution of the deed, but there is no suggestion that Rumph assumed this duty as part of the consideration. Before the deed was signed Rumph, who is retired, visited Dumas two or three times a week and sometimes took him to church, but the evidence indicates that other neighbors and fellow church members of the old man were equally kind in bringing him food and looking after him when he was ill. On the whole we are unable to say that the chancellor, who had the great advantage of seeing the witnesses, was wrong in canceling the deed.

By cross appeal it is contended that the award of $255 for Rumph's advances and services is too liberal. Rumph testified, though not undisputedly, that he attended Dumas night and day from about December 7 until the sick man was taken to the hospital four days before his death. Dumas's niece, a witness adverse to Rumph, voluntarily stated on direct examination that Rumph had told her that his books showed advances of about $255. The administrator and another witness

in his behalf quoted Rumph as having said that he had spent from $200 to $250 for groceries, utility bills, etc. Rumph himself was inhibited by the dead man's statute from proving his expenditures. The administrator voluntarily introduced the testimony that we have mentioned, in an effort to show that the consideration was decidedly inadequate, and we do not think he is entitled to complain of the chancellor's decision to accept it as true.

Affirmed.

ROBINSON, J., not participating.

HARRIS, C. J., dissents.

CARLETON HARRIS, Chief Justice, dissenting. In my opinion, the evidence did not establish that Peter Dumas was mentally incompetent at the time of the execution of the deed; in fact, in my view, a preponderance of the testimony showed Dumas to be competent. I accordingly respectfully dissent.